## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
## AT CHARLESTON

**KRISTIN M. KINGREY,**

      **Plaintiff,**

**V.**                                                  **Civil Action No. 2:21-cv-00612**

**CHRISTINE WORMUTH, SECRETARY**
**OF THE DEPARTMENT OF THE ARMY;**
**FRANK KENDALL, SECRETARY OF THE**
**DEPARTMENT OF THE AIR FORCE**

      **Defendants.**

## PLAINTIFF'S RESPONSE IN OPPOSITION TO
## DEFENDANTS' MOTION TO DISMISS AND/OR FOR SUMMARY JUDGMENT

Master Sergeant Kristin M. Kingrey has proudly served her country for more than fifteen years. Her sacrifice and hard work on behalf of her nation paid off and her career within the West Virginia Air National Guard ("WVANG") was advancing accordingly. Then, in November 2018, Brigadier General Michael Cadle asked Lieutenant Colonel Kelly Ambrose—the Human Resource Officer ("HRO") and Sgt. Kingrey's former boss—to lunch so that he could deliver a message from on high. Brigadier General Cadle informed Ambrose that Sgt. Kingrey's career advancement would be hindered unless she took steps to appear more feminine, including growing her hair and wearing makeup. She did not, and Brigadier General Cadle's prophecy came true.

In 2020, after Brigadier General Cadle took over as the supervisor of the Human Resources Office—with an officer closely mentored by him as his deputy—the WVANG rescinded a civilian job that Sgt. Kingrey had already been awarded, using a bogus excuse of "budget cuts." Not stopping there, the WVANG then denied her a subsequent civilian position.

Sgt. Kingrey filed a federal equal employment opportunity (EEO) complaint. Lt. Col. Ambrose, and another former deputy in the office, backed up her complaints. Within days, all three women were informed that they were under investigation for alleged improper "fraternization."

During all times in question, Plaintiff was a "dual status technician," meaning that she wore two hats, although not at the same time. Some of the time she was on military duty; at other times she was a civilian employee working for the Departments of the Army and the Air Force. The U.S. Code classifies a dual status technician as a "Federal civilian employee," and her claims in this case arise solely from her civilian role. As a result—and despite the Defendants' attempt to throw everything (even the kitchen sink) at Sgt. Kingrey in an attempt to prevent her claims from ever being presented to a jury—Plaintiff has properly alleged that she was unlawfully discriminated against under Title VII. As a civilian employee bringing civilian employment claims, Sgt. Kingrey's claims are not blocked by the doctrine that bars military members from suing the military in federal court. Accordingly, the Court should deny the Defendants' Motion to Dismiss and/or for Summary Judgment (ECF No. 42) and permit this case to be tried to a jury.

## I.    FACTUAL BACKGROUND

*A.    Plaintiff Kingrey's civilian career at the WVANG is threatened because of her protected status as a lesbian woman*

Master Sergeant Kristen Kingrey is female and is openly lesbian. *See* Board Decl. 41:8–19 (testifying that "it was common knowledge that Master Sergeant Kingrey was openly gay"). Plaintiff has described herself as having "a more masculine physique." Kingrey EEO Decl. 2. She is tall, lifts weights, and "outwardly present[s] more like a male." *Id.*



Plaintiff is also a member of the West Virginia Air National Guard ("WVANG") and a veteran. Since joining the WVANG in September 2007, she has been called to active duty twice, serving in Iraq for six months in 2009 and in Qatar for six months in 2018. Kingrey Dep. 9:8–13, 10:19–11:7.

At times throughout her career, Plaintiff has been on the receiving end of discriminatory comments about her sexual orientation and gender presentation.

WVANG members spread rumors that Plaintiff was "transitioning" from female to male. *Id.* at 48:16–49:8. When that matter was brought to Brigadier General Michael Cadle's attention, he told Plaintiff to "work it out." *Id.*

When Plaintiff later had an issue with one of the same WVANG members, who also identified as lesbian, Brigadier General Cadle was quick to ask if the reason they were having issues was because they had previously dated (they had not). Kingrey EEO Decl. 2 ("COL Cadle asked if MSgt Clark and I were ever in a relationship, which to me was additional discriminatory comments in the fact that he was stereotyping us as having dated since we were both lesbians."); Kingrey Dep. 39:24–40:12.

At other times, Plaintiff was harassed about the short length of her hair, even though it complied with all applicable standards. Kingrey Dep. 43:24–44:18.

An issue also arose because Plaintiff began wearing a male Honor Guard jacket because she did not fit into any of the women's dress uniforms. Before having a jacket altered for her, Brigadier General Cadle forced her, in front of others, to try to fit into the women's jacket that was known not to fit her. *Id.* at 46:4–47:3 (describing the incident as "slightly humiliating").

Despite these issues, Plaintiff has had a successful career with the WVANG. Since joining the WVANG, Plaintiff has been employed as a "military technician (dual status)" (also referred to as a "dual status technician"). Kingrey 2d Decl. ¶ 1. This position is statutorily created and defined in the U.S. Code. 32 U.S.C. § 709(b); 10 U.S.C. § 10216(a). Although her job title may imply otherwise, Plaintiff does not perform her dual roles simultaneously. Kingrey 2d Decl. ¶¶ 2–3. She has different duties depending on whether she is on military or civilian technician status. *Id.* at ¶ 3. She receives different pay and different benefits depending on whether she is on military or civilian technician status. Kingrey Dep. 65:17–67:24 (indicating that she receives higher pay and does not have to pay for her benefits out of her salary when she is on military orders).

Plaintiff has performed in an exemplary fashion throughout the course of her career, and, up until she filed her claims against the Defendants, she had received only positive evaluations. Kingrey 2d Decl. ¶ 4. On the civilian side of her dual status role, Plaintiff has worked in the WVANG's Human Resource Office since August 2016. Kingrey EEO Decl. 1.

The WVANG's Human Resource Office, and the Human Resource Officer ("HRO")— who is in charge of that office—are responsible for "administer[ing] the full time manning program for the National Guard." Cadle Dep. 16:21–17:7.

In approximately July 2018, Lieutenant Colonel Kelly Ambrose became the HRO at the WVANG. Ambrose Decl. 1. In November 2018, Brig. Gen. Michael Cadle called Lieutenant Colonel Ambrose and asked her to lunch. *Id.* at 5. Lieutenant Colonel Ambrose presumed he wanted to discuss common complaints that commanders had with HRO. *Id.* To her surprise, Brigadier General Cadle turned the focus of the conversation to the Plaintiff. *Id.* According to Lieutenant Colonel Ambrose, the conversation played out as follows:

> After some small talk, he said, I need you to do a favor for me, I need you to mentor [Plaintiff] to have her grow her hair out and to start wearing makeup because if she did not, it would "hurt her career progression."

*Id.*

Shocked and disturbed by this directive, Lieutenant Colonel Ambrose promptly reported the conversation to her colleague, Chief Helen Toby. Toby Decl. 6.

Despite his request, Lieutenant Colonel Ambrose declined to counsel Plaintiff to change her looks:

> I responded that TSgt Kingrey was one of the best employees that I have. I said she is who she is and I would not change that. I also told him she does her job flawlessly, she comes in early, leaves late, and does absolutely everything her job requires of her and more. I told him I would not have that conversation with her.

Ambrose Decl. 5.

B.     *Plaintiff Is Awarded HRDS Position—Until She Is Not*

In December 2018, Plaintiff Kingrey applied for a listed position of Human Resource Specialist (Human Resource Development) (HRDS) GS-0201-11 (hereinafter "HRDS position"), a civilian role within WVANG's Human Resource Office.[1] *See* Board Decl. 14:16–15:15.

---

[1] Plaintiff notes that in some of the declarations the HRDS position is also called a "Training NCO position" or "Training Manager position." *See* Board Dep. 14:20–15:6; *see generally* Ambrose Decl.

5

The interview panel for the position consisted of Lieutenant Colonel Chad Board, Lieutenant Colonel Kelly Ambrose, and Chief Helen Toby. Ambrose Decl. 2; Board Dep. 15:11–12. It is undisputed that Plaintiff interviewed well. Board Dep. 15:23–16:2. In fact, all three panel members agreed that she was the best candidate for the position. *Id.* at 17:5–7.

As the HRO, Lieutenant Colonel Ambrose was the "Selecting Official" for the panel and was given signatory authority to hire the individual selected for the HRDS position. Ambrose Decl. 2; Board Decl. 17:8–21. Acting upon that authority, Lieutenant Colonel Ambrose "contacted [Plaintiff] by telephone to offer her the position." Ambrose Decl. 2. Plaintiff "accepted the offer on that same telephone call when the offer was made." *Id.*; Toby Decl. 3 (confirming the same); Kingrey Dep. 17:4–21 (same).[2]

During her deployment, Plaintiff suffered an injury, and upon returning home was placed on medical convalescent orders. Kingrey Dep. 12:5–15. She remained on those orders until December 2020. *Id.* Nevertheless, in preparation for assuming her HRDS position, Plaintiff completed training for that role. *Id.* at 23:6–9; Training Emails.[3]

---

[2] The Defendants argue that Plaintiff was not hired for the position because certain documentation was not completed. Lieutenant Colonel Ambrose, the HRO at the time, testified that those documents could *not* be completed while Plaintiff was on medical convalescent orders. Ambrose Decl. 3. Nevertheless, the completion of the forms is irrelevant. All that matters is that Plaintiff was selected for the position, and it was later rescinded, facts which are undisputed.

[3] Each of these emails pertain to training Plaintiff underwent in preparation for the HRDS role. The Plaintiff notes that certain emails are particularly significant, however. For example, pages 13–14 show that Lieutenant Colonel Ambrose completed a "System Authorization Access Request" on May 28, 2019, indicating that Plaintiff had the role of "Technician Training Officer" and that she needed access to view training statistics and run reports. Page 18 shows an email from Major Bridget Saunders, stating that Plaintiff had taken over her role. Lieutenant Colonel Board testified that Major Saunders had previously held the training manager (or HRDS) position. Board Decl. 22:10–23:19.

C.     *After Brigadier General Cadle Becomes Acting HRO, Plaintiff's HRDS Position Is Rescinded Due to Her Protected Status*

At the time Plaintiff interviewed for, was awarded, and underwent training for the HRDS position, Lieutenant Colonel Ambrose served as the HRO. Ambrose Decl. 1.

However, in February 2020, Lieutenant Colonel Ambrose left her position as HRO. *Id.* In March 2020, Brigadier General Cadle stepped in as the acting HRO. *See* Board Dep. 33:23–34:5, 37:6–24; Defs.'s Resp. to Pl.'s Discovery Requests. at 31, ¶ 12 (admitting that Brigadier General Cadle served "as a general supervisor over the HRO" from "March 2020 to January 2021); *see also* May 15, 2020 Distribution Email (indicating job distribution was authorized by "Col Michael O. Cadle – NGWV HRO").[4]

Brigadier General Cadle was, and remains, Lieutenant Colonel Board's long-term mentor. Board Dep. 36:3–17. Brigadier General Cadle used his mentorship position and his supervisory role in the Human Resource Office to exert significant control over hires. During this time period, Lieutenant Colonel Board reported directly to Brigadier General Cadle. Board Dep. 38:14–18. He testified that Brigadier General Cadle held weekly meetings in the Human Resource Office, set expectations, and approved all job announcements for distribution. *Id.* at 38:23–39:15; Toby Decl. 2.

Chief Toby testified that she had "first hand experience of Lt Col Board making decisions under Col Cadle's direct guidance," and that on at least one other occasion involving the hire of individual belonging to a protected class, an African-American woman, Lieutenant Colonel

---

[4] Brigadier General Cadle testified that he did not know if he was ever "officially" named the interim HRO but nonetheless agreed that he served as the supervisor of the Human Resource Office starting in March 2020. *See* Cadle Dep. 17:8–10, 24:15–26:1.

Board told her that "Col. Cadle would never allow [him] to hire that individual" for such a high position. Toby Decl. 5.[5]

Shortly after Brigadier General Cadle assumed this supervisory role over HRO, Lieutenant Colonel Board began searching for a way not to honor awarding Plaintiff the HRDS position. *See* Ambrose Decl. 4. Lieutenant Colonel Ambrose declared that Lieutenant Colonel Board first proposed to rescind the position because Plaintiff was on convalescent orders, but he was advised that it would be unlawful to do so. *Id.* Lieutenant Colonel Board ultimately decided to blame the rescission on funding. *Id.*; Board Dep. 23:20–24:10; Kingrey Dep. 76:2–6 ("I had that job. That didn't change until Colonel Cadle came back into the picture in the spring of 2020. In the spring of 2020 that's when Colonel board called me to tell me that the funding had all of a sudden been pulled.").

 Yet, Lieutenant Colonel Ambrose, who had served as the HRO until the preceding month, stated that Lieutenant Colonel Board's justification was false:

> When TSgt Kingrey told me Lt Col Board called her and said the Army pulled the funding for her Training NCO position, I knew he was lying. We never lost funding for any fulltime positions.

Ambrose Decl. 4. In the case of budgetary concerns, the HRO's practice is to terminate technicians filling temporary positions before terminating those who have been awarded permanent positions. *Id.* at 5 ("If funding had been lost, however, the HRO would not have denied any servicemember an already hired permanent positions, but would have started cutting the temporary technicians to preserve money."); Toby Decl. 5 ("[S]hould a budgetary issue take place, it was our first practice to terminate temporary technicians. We never cut temporary

---

[5] Colonel Cadle was later promoted to the rank of Brigadier General, the title to which he is referred throughout Plaintiff's memorandum.

technicians, indefinite technicians or permanent technicians due to funding during my entire 3 year tenure during HRO due to Army funding.").

That is underscored by subsequent events: the fact the same position for which funding was supposedly was reposted less than two months later. *See* Toby Decl. 5 ("By his advertising and hiring the job shortly after, I knew it could not have been a budgetary issue."); May 15, 2020, Distribution Email (reposting HRDS position on May 15, 2020). And the person who was selected for the reposted job was given a higher rate of pay. Ambrose Decl. 4.[6]

D.    *Plaintiff Suffers Continuing Discrimination and Is Denied the Employee Benefits Position*

In September 2020, Plaintiff applied for a second civilian status position within the Human Resource Office. This position is referred to as the "Employee Benefits position."

Plaintiff Kingrey interviewed for but was ultimately denied the Employee Benefits position. Plaintiff was qualified at a higher level than the individual who was selected for the position. *See* Kingrey EEO Decl. 3 (explaining that she qualified as a GS-11 but the selectee qualified only as a GS-9); *see also* Resume & Application of Selectee. Additionally, Plaintiff had more experience working in employee benefits than the selectee. Kingrey EEO Decl. 3 (explaining that the selectee was a temporary technician who only had experience in staffing). Indeed, it is apparent from the selectee's application that he had only recently joined the WVANG. *See* Resume and Application of Selectee. Moreover, while Plaintiff has served two active-duty tours, the selectee is a non-veteran. *See* Justification for Selection of Non-Veteran.

---

[6] Additionally, despite telling Plaintiff that he would inform her when the position was relisted, Lieutenant Colonel Board failed to do so. Kingrey EEO Decl. 6. She did not see the relisting and therefore did not apply. *Id*

Importantly, the individual who was selected for the position is outside of Plaintiff's protected class. Board Decl. 35:19–36:2 (agreeing that the selectee is a male who is married to a woman, i.e., heterosexual).

At the time Plaintiff was denied the Employee Benefits position, Lt. Chad Board was serving as the Deputy HRO and Brigadier General Cadle was still acting as his supervisor. Board Dep. 33:21–34:5.

E.      *Plaintiff files an Equal Employment Opportunity Complaint and the Defendants Retaliate*

Plaintiff filed an Equal Employment Opportunity ("EEO") complaint on October 19, 2020, alleging that the recission of the HRDS position and the denial of the Employee Benefits position were discriminatory. *See* EEO Compl. To support her claim, Plaintiff set forth the statements of Brigadier General Cadle and other instances of discriminatory animus she experienced at the WVANG while serving in her civilian capacity. *Id*

At the end of March 2021, Lieutenant Colonel Ambrose and Chief Toby submitted declarations supporting Plaintiff's claims. *See* Ambrose Decl.; Toby Decl. Just days later, Lieutenant Colonel Ambrose, and Chief Toby were all informed that they were being investigated for fraternization. Kingrey 2d Decl. ¶ 6; Apr. 7, 2021 Email 2. Plaintiff was notified and informed about this investigation while she was in her civilian status. *Id.* at ¶ 7; Kingrey Dep. 54:15–16.

Additionally, after filing her EEO complaint, Plaintiff received her first mediocre performance review. *Id.* at 71:9–75:1 (explaining how that evaluation was mediocre and did not reflect her work); Evaluation. Lieutenant Colonel Board was the "higher level reviewer" on that evaluation. *See Id.* at 2.

Plaintiff did not receive a Final Agency Decision until August 2021. *See* Final Agency Decision. After receiving that decision, Plaintiff exercised her right to file her claims in this Court.

## II.     ARGUMENT

### A.     Sovereign Immunity does bar to Plaintiff's Title VII claims

It is indisputable that Congress has waived its sovereign immunity for civilian employees of the military branches.

Because Plaintiff is a civilian employee, that waiver permits her claim to go forward. Indeed, federal statutes and Supreme Court caselaw provide that Plaintiff is a civilian employee. *See* 32 U.S.C. § 709(b); 10 U.S.C. § 10216(a); *Babcock v. Kijakazi*, 142 S. Ct. 641, 645 (2022). Additionally, to the extent the Court seeks to assess Plaintiff's dual roles, Plaintiff's claims are not related or incident to her military service.

#### 1.     *Plaintiff is a Federal civilian employee under the law*

The Defendants assert that they are entitled to sovereign immunity because "Congress has not waived its sovereign immunity to allow uniformed members of the armed forces to pursue discrimination claims under Title VII of the Civil Rights Act of 1964." ECF No. 46, at 7. However, that is a misrepresentation of Plaintiff's claims.

As more thoroughly discussed below, Plaintiff's claims did *not* arise in her role as a uniformed member of the armed forces. Rather, her claims arose while she served for a "military department" in a civilian capacity.

Congress has waived its sovereign immunity for individuals working for "military departments." 42 U.S.C. § 2000e-16(a). "Military departments" are further defined in the U.S.

Code as The Department of the Army, The Department of the Navy, and The Department of the Air Force. 5 U.S.C. § 102.

It is true that Fourth Circuit, along with every other circuit to address the matter, has held that Title VII's abrogation of sovereign immunity includes "only civilian employees of the military departments," *Randall v. United States*, 95 F.3d 339, 343 (4th Cir. 1996).[7] But that holding does not prevent individuals like Plaintiff Kingrey—who serve in dual status roles—to bring claims relating to their civilian employment.

Plaintiff's dual status position is best understood as granting her two positions: one as a uniformed member of the armed forces and one as a civilian working for the WVANG. The position was described well by the U.S. Court of Appeals for the Federal Circuit in *Jentoft v. United States*:

> The National Guard employs technicians for certain civilian duties, including the administration and training of the National Guard and the maintenance and repair of supplies issued to the National Guard or the armed forces. In that respect, the National Guard technicians are employees of both the military and of the United States.

450 F.3d 1342, 1343–44 (Fed. Cir. 2006).

The dual status technician role is statutorily created and defined. Federal law specifically provides that "a military technician (dual status) is a Federal **civilian** employee." 32 U.S.C. § 709(b); 10 U.S.C. § 10216(a) (emphasis added).

---

[7] Plaintiff notes that the Defendants' bold and italicized citation to *Randall* is misleading. *See* ECF No. 46, at 9 (citing *Randall* and arguing that the term "military departments" "includes ***only purely civilian employees*** employed by the 'military departments.'"). The addition of the word "purely" before "civilian" makes *Randall* appear much more restrictive than it is.

The United States Code does not provide any limiting language as to when these technicians are "civilian." In fact, the law plainly states that this definition applies for the purposes of "**any other provision of law**." 10 U.S.C. § 10216(a) (emphasis added).

The Supreme Court noted, just las term that "the role, capacity, or function which a technician serves **is that of a civilian, not a member of the National Guard**." *Babcock v. Kijakazi*, 142 S. Ct. 641, 645 (2022) (emphasis added).

> While working in a civilian capacity, technicians are not subject to the Uniform Code of Military Justice. *See* 10 U.S.C. §§ 802(a)(3)(A)(ii), 12403, 12405. **They possess characteristically civilian rights to seek redress for employment discrimination** and to earn workers' compensation, disability benefits, and compensatory time off for overtime work. *See* 32 U.S.C. § 709(f)(5); 42 U.S.C. § 2000e–16; 5 U.S.C. §§ 8101 et seq., 8337(h), 8451; 32 U.S.C. § 709(h). And, as particularly significant in the context of retirement benefits, technicians hired before 1984 are members of the "civil service" entitled to pensions under Title 5 of the U. S. Code, which governs the pay and benefits of civil servants. *See* 5 U.S.C. § 2101. These provisions demonstrate that Congress consistently distinguished technician employment from National Guard service.

*Id.* at 646 (emphasis added).[8]

The Supreme Court held that this civilian characterization "holds true" even where the plaintiff "also served at other times in a different capacity as a member of the National Guard." *Babcock*, 142 S. Ct. 646. Thus, the Court specifically rejected the argument "that the statutory requirement for technicians to maintain National Guard membership makes all of the work that they do count as Guard service," reasoning that " [a]condition of employment is not the same as the capacity in which one serves." *Id.*

Because there is no statutory limiting language as to when dual status technicians like Plaintiff are civilian employees, and indeed, because it states that the definition is to apply under "any other provision of law," Plaintiff must be considered a Federal civilian employee of the

---

[8] Although *Babcock* is a Social Security opinion, 10 U.S.C. § 10216(a) specifically states that a technician serves as a civilian "for purposes of . . . any other provision of law."

"military departments" for whom sovereign immunity has been waived. *See id.*; *Jentoft*, 450 F.3d at 1348–49 (noting the lack of limiting language in § 10216(a)); *see also Crespo v. Holder*, 631 F.3d 130, 133 (4th Cir. 2011) (noting that courts must enforce the plain language of statutes).

Although the Defendants cite to *Randall* as foreclosing Plaintiff's claim, *Randall* did not address the claims of a dual-status technician.[9] And neither the *Randall* Court nor any subsequent Fourth Circuit panel has been called upon to address the language set forth in § 10216(a).

Moreover, even if the Court were to determine that Congress did not intend for dual status technicians to be treated as civilian employees at *all* times—a holding Plaintiff maintains is at odds with the statutory text and the Supreme Court's pronouncement in *Babcock*, 142 S. Ct. at 47 ("It turns on how Congress classified the job—and as already discuss, Congress classified dual-status technicians as 'civilian'")—her claims are still not bared by sovereign immunity because her claims arise from her civilian role.

To best understand Plaintiff's dual status role, it is helpful to compare her to other individuals who serve in the military but also are employed in civilian positions. Sometimes, like Plaintiff, those positions are with a military department, but sometimes they are not. It is conceivable, for example, that someone could be enlisted in the National Guard and could hold a civilian role at the United States Postal Service. If it were the case that while serving in that civilian role, and that individual was discriminated against on the basis of sex, USPS could not argue that because the employee is *also* a uniformed member of the armed services, that they could not bring a Title VII claim. That is what the Defendants are seeking to do here.

---

[9] Unlike this case, *Randall* addressed the Title VII claims of a service member who was denied a military promotion. *See Randall v. United States* 95 F.3d 339, 340 (4th Cir. 1996).

Accordingly, Plaintiff's membership with the WVANG is not dispositive of whether Plaintiff's claims are barred by sovereign immunity. Even the cases relied on by the Defendants involved additional claims that were incident to military service. *See, e.g., Perez v. Puerto Rico Nat'l Guard*, 951 F. Supp. 2d 279, 293–94 (D.P.R. 2013). That is simply not the case here. As discussed below, Plaintiff's Complaint does not seek to redress discrimination that occurred while she was serving as a uniformed member of the armed forces. And given that the positions she was denied were civilian roles in a military department, the waiver of sovereign immunity in Title VII allows her to bring her claims before this Court. *See* 42 U.S.C. § 2000e-16(a).

## B. The *Feres* Doctrine does not bar Plaintiff's Title VII claims

The concept of intra-military immunity, also known as the *Feres* Doctrine, provides that servicemembers cannot sue for injuries that "arise out of or are in the course of activity incident to service." *Feres v. United States*, 340 U.S. 135, at 146 (1950). The *Feres* Doctrine recognizes that civilian courts should not intrude on *military* discipline or structure. *See Chappell v. Wallace*, 462 U.S. 296 (1983).

The Defendants devote many pages to briefing the argument that courts may not impose liability on incidents arising from "military service," which is fine, but completely inapposite to Plaintiff's claims arising from civilian employment.

First, the *Feres* Doctrine does not apply, because Plaintiff is a "Federal civilian employee." Again, the U.S. Code deems the Plaintiff a Federal civilian employee at all times. *See* 32 U.S.C. § 709(b); 10 U.S.C. § 10216(a); *Babcock v. Kijakazi*, 142 S. Ct. at 645–47 ("It turns on how Congress classified the job—and as already discussed, Congress classified dual-status technicians as 'civilian.'"); *Jentoft*, 450 F.3d 1348–49. Moreover, since 10 U.S.C. § 10216

is an act of Congress that *post*-dates *Feres*, this Court must give priority to Congress's statutory enactment. *Id.*

And because federal law designates Plaintiff as a "Federal civilian employee," she unambiguously falls into the category of civilian employees working for "military departments" to whom Title VII applies, such that the *Feres* Doctrine is not implicated.

Second, even if the Court does not accept that Plaintiff is a Federal civilian employee at all times, her claims are still not barred by the *Feres* Doctrine. There is no controlling Fourth Circuit law regarding whether a dual status technician may bring a Title VII claim.

Application of the *Feres* doctrine depends on whether the injury suffered is "incident to" military service. *Aikens v. Ingram*, 811 F.3d 643 (4th Cir. 2016). To conduct this inquiry, the court looks to "whether 'particular suits would call into question military discipline and decisionmaking [and would] require judicial inquiry into and hence intrusion upon, military matters.'" *Id.* at 651 (quoting *Cioca vv. Rumsfeld*, 720 F.3d 505, 515 (4th Cir. 2013)).

In *Aikens*, the Fourth Circuit determined that the *Feres* Doctrine barred the suit of a dual-status employee seeking to sue the state adjutant general under § 1983. *Aikens*, however, is readily distinguishable from the case before this Court. The conduct at issue in *Aikens* occurred while the dual status technician was serving in *both* his military and civilian capacities. *Id.* at 652. Aiken's claim was based on claims that the defendants violated his Fourth Amendment rights by intercepting his emails and forwarding it to others in his chain of command, subjecting him to discipline. *Id.* at 646. The court noted that "Appellant was on active duty, deployed in a war zone, and used a computer system set up by the DOD for military personnel deployed at Camp Doha," and his computer usage was regulated by military rule and was monitored by the

defendants on a DOD computer system. *Id.* at 652. Accordingly, the court concluded that "the alleged infringement occurred incident to Appellant's military service." *Id.*

Moreover, the Defendants' contention that "courts have also been nearly unanimous in applying *Feres* to bar claims by dual status technicians," is demonstrably false. *See* ECF No. 46, at 16. The Defendants' quote to a nearly 20-year-old decision out of the Second Circuit. But that quotation fails to appreciate that the bulk of federal circuit courts, including the Second Circuit, have found that dual status technicians *can* bring Title VII claims when those claims assert injuries that were incurred while the technician was serving in a civilian capacity.

Indeed, the vast majority of Federal Circuits have held that dual status technicians may bring Title VII suits if the claims arise from the civilian aspects of their jobs. *See Norris v. McHugh*, 857 F. Supp. 2d 1229 (M.D. Ala. 2012), *aff'd sub nom. Norris v. Sec'y, U.S. Dep't of Army*, 517 F. App'x 873 (11th Cir. 2013) ("[T]he vast majority of circuits to address the issue have distinguished suits arising from a technician's status as a member of the military from suits arising from his or her status as a civilian federal employee. This second approach foresees the theoretical possibility that a dual-status technician may pursue employment discrimination claims if the claims arise only from the civilian aspect of his or her job.").[10]

---

[10] *Brown v. United States*, 227 F.3d 295, 299 (5th Cir. 2000) (holding claims arising purely from an employees' civilian position are provided for under Title VII); *Walch v. Adjutant Gen.'s Dep't of Texas*, 533 F.3d 289 (5th Cir. 2008) ("Congress has permitted Title VII claims to be brought by National Guard technicians."); *Mier v. Owens*, 57 F.3d 747, 750 (9th Cir. 1995) ("Title VII coverage of civilians employed by the military encompasses actions brought by Guard technicians except when the challenged conduct is integrally related to the military's unique structure."); *Overton v. N.Y. State Div. of Military & Naval Affairs*, 373 F.3d 83, 95–96 (2d Cir. 2004) (the intra-military immunity doctrine prohibits a Title VII claim by a dual-status technician only if the claim "(1) challenges conduct integrally related to the military's unique structure or (2) is not purely civilian" in nature.); *Luckett v. Bure*, 290 F.3d 493 (2d Cir. 2002) (finding Title VII protections extend to discrimination actions brought by military personnel in hybrid jobs entailing both civilian and military aspects, except when the challenged conduct is integrally related to the military's unique structure); *see also Laurent v. Geren*, 2008 WL

Only one outlier federal circuit – the Sixth Circuit – has imposed a bright-line rule that dual status technicians may not bring Title VII suits. *Fisher v. Peters*, 249 F.3d 433, 443 (6th Cir. 2001). Fourth Circuit precedent counsels strongly against the adoption of the Sixth Circuit's bright-line rule. *See, e.g.*, *Aikens*, 911 F.3d at 651–52 (analyzing instead whether conduct was incident to service). Accordingly, this Court should follow the majority of courts and find that Plaintiff may bring a Title VII suit if her claims arise from the civilian aspects of her role (as they do in this case).

As stated throughout the Complaint, Plaintiff asserts that the Military Departments of the Army and Air Force discriminated against her by revoking and withholding civilian positions because of her sexual orientation and gender presentation. Such discrimination on the basis of sex is unlawful, and Title VII's textual application to "military departments" allows her to bring her claim to this Court.

Nowhere in their 27 pages of briefing do the Defendants deny—let alone present admissible evidence refuting—that the positions that the Defendants unlawfully took from or denied to Plaintiff were civilian in nature. These employment decisions, which pertain to HR

---

4587290 (D.V.I. Oct. 10, 2008) (permitting Title VII claim to advance where Plaintiff alleged that discrimination occurred in the course of her civilian duties and noting that "[c]reating a sexually hostile environment is not integrally related to the military's mission.").

Moreover, nearly every case that has been dismissed alleges injuries that are inextricably related to military service. *See, e.g., Brown*, 227 F.3d at 297 (dual status technician was discharged from the military, causing him to lose his civilian role); *Walsh*, 533 F.3d at 291–92 (same); *Mier*, 57 F.3d at 748 (dual status technician was denied military promotion and thus lost civilian role); *Zuress*, 606 F.3d at 1252 (dual status technician brought claims alleging that she was denied military promotions, detailed to a lower position, and forced into retirement); *Norris*, 857 F. Supp. 2d at 1235 (dual status technician was removed from her civilian position due to her conduct while on military duty). That is plainly not the case here. The discrimination suffered by the Plaintiff happened *solely* within the context of her civilian position. It has no basis on her military standing and does not call into question military decisions or military discipline.

roles, are not incident to military service and do not require this Court to second-guess military personnel decisions.

Accordingly, this Court should find that Plaintiff's Title VII claims are not barred by the *Feres* Doctrine.

**C.    Plaintiff has produced sufficient evidence to have her case tried to a jury**

Title VII claims are addressed using the *McDonnell Douglas* burden-shifting framework whereby (1) the plaintiff has the burden of establishing a prima facie case of discrimination, (2) the burden then shifts to the employer to provide a legitimate non-discriminatory reason for alleged unlawful action, and (3) the burden shift backs to plaintiff to prove that the proffered non-discriminatory reason is pretextual. *See Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 267 (4th Cir. 2005).

Depending on the type of Title VII claim, the *prima facie* case varies. For example, plaintiffs claiming that they were unlawfully terminated from their positions must show different evidence than plaintiffs claiming they were retaliated against for engaging in a protected activity. The Defendants' motion fails to appreciate these differences and muddles Plaintiff's claims. Nevertheless, as set forth below, Plaintiff has produced sufficient evidence to present both Count I and Count II to a jury.

*1.    Plaintiff has produced sufficient evidence of her failure to hire claims in Count I*

Plaintiff's claims in Count I are best described as a "failure to hire." To establish a *prima face* case of sex discrimination for failure to hire, a plaintiff must show, "(1) she is a member of a protected group; (2) she applied for the position in question; (3) she was qualified for that position; and (4) defendants rejected her application under circumstances that give rise to an inference of unlawful discrimination." *Anderson*, 406 F.3d at 268.

19

Defendants do not appear to contest that Plaintiff is a member of a protected group, that she applied for the HRDS and Employee Benefits positions, or that she was qualified for the positions. Instead, they argue that she has failed to satisfy the fourth element, that is to show the circumstance surrounding the withdrawal of the HRDS position and the denial of the Employee Benefits position give rise to an inference of unlawful discrimination.

     **a.   HRDS Position**

With respect to the HRDS position, the Defendants argue that Plaintiff was never awarded the HRDS position. This argument is not only belied by the affidavit of Lieutenant Colonel Ambrose, who swore under penalty of perjury that Plaintiff was selected for the job, that she was offered the position over the phone, and accepted the position, Ambrose Decl. 3, but also by the testimony of the Plaintiff. Kingrey Dep. 77:6–12. It is further evidenced by the fact that Plaintiff completed training for the HRDS position. *Id.* at 23:6–9; Training Emails.

Additionally, it ultimately does not matter whether Plaintiff "officially" received the job, because it is apparent that she applied for it, was qualified for it, was deemed the best candidate, but nevertheless was ultimately denied the position. Board Dep. 17:5–7, 23:20–24:4.[11]

Beyond that, Plaintiff has presented ample evidence which shows that decision to take back the HRDS position was discriminatory, including (1) Brigadier General Cadle's statements to Ambrose explicitly threatening Plaintiff's advancement within WVANG if she did not change her appearance and begin to look more feminine;[12] (2) the fact that Plaintiff's position was withdrawn by Lieutenant Colonel Board, shortly after Brigadier General Cadle became his direct

---

[11] Indeed, if Plaintiff had not been selected for the position, Lieutenant Colonel Board would not have been forced to call and rescind the position later.

[12] Ambrose Decl. 5

supervisor and the acting HRO;[13] (3) Lieutenant Colonel Ambrose's assertion that there were no funding issues;[14] and (4) past issues in the WVANG relating to Plaintiff's sexual orientation and gender presentation.[15]

Accordingly, Plaintiff has satisfied all four elements of the *prima facie* case and the burden shifts to the Defendants to proffer a legitimate non-discriminatory reason for the adverse employment action. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000). To this end, the Defendants submit that Plaintiff was ultimately denied the HRDS position because of budgetary concerns. ECF No. 46, at 22.

Lieutenant Colonel Ambrose's declaration, however, states not only that there were no budgetary issues, but also that Lieutenant Colonel Board had tried to come up with other reasons not to "honor" Plaintiff's award of the HRDS position. Ambrose Decl. 4. That is the essence of pretext. Because Plaintiff has presented evidence that that proffered reason is false, she has carried her burden of showing pretext.

Inasmuch as there is a genuine dispute as the truth of the Defendants' proffered reason, the finder of fact should be permitted to determine whether the proffered reason is worthy of any credence. *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 256 (1981) (holding that a plaintiff can carry her burden of persuasion "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence").

---

[13] Board Dep. 33:23–34:5, 37:6–24; 38:14–18; Defs.'s Resps. to Pl.'s Discovery Reqs. at 31, ¶ 12; Kingrey Dep. 76:2–6.
[14] Ambrose Decl. 4.
[15] Kingrey EEO Decl. 2; Kingrey Dep. 39:23–40:12; 43:24–44:18; 46:4–47:3, 48:16–49:8.

### b. Employee Benefits Position

It is similarly undisputed that Plaintiff satisfies the first three elements of the *prima facie* case for the employee benefits position. She is a female lesbian (member of a protected class), she applied for the position, and she was qualified for the position. The Defendants essentially contend that there are no circumstances that give rise to an inference of unlawful discrimination because the decision not to hire her was unanimous and she ranked fourth out of the seventeen applicants. *See* ECF No 46, at 22–23. However, the plaintiff's prima facie case burden is "not onerous." *Burdine*, 450 U. S. at 253. "[T]he prima facie case "raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." *Id.* at 254.

Here, in addition to the discriminatory statements of Brigadier General Cadle and the general homophobic and gender conforming atmosphere to which Plaintiff has been subjected for years, the testimony establishes that Plaintiff, a lesbian woman, was rejected for a position in favor of a straight male, with less experience in HRO, who was not a veteran, and who qualified at a lower GS level than Plaintiff. Kingrey EEO Decl. 3; Resume & Application of Selectee 2 (showing selectee as being qualified as a GS-9). These facts are sufficient to satisfy Plaintiff's *prima facie* case. *See Burdine*, 450 U.S. at 253 n.6.

The Defendants' proffered non-discriminatory reason for the failure to hire is that "Plaintiff did not interview as well as the top three candidates and answered some of the interview questions incorrectly according to the interview panel." ECF No. 46, at 23.

As set forth above, Plaintiff has presented sufficient evidence to demonstrate that the proffered reason is false. Such evidence includes the blatant statements of Brigadier General Cadle that Plaintiff was not going to advance within the WVANG unless she made herself

appear more feminine. It also includes that Plaintiff began being denied positions immediately after Brigadier General Cadle assumed a supervisory role within the Human Rights Office. Accordingly, it is disingenuous to argue that there is not, at a minimum, a genuine issue of material fact as to whether the Defendants' failure to hire Plaintiff for the employee benefits position was unlawful discrimination under Title VII.

2.    *Plaintiff has produced sufficient evidence to proceed on her retaliation claim in Count II*

To state a *prima facie* case for retaliation, a plaintiff must show that "(1) he engaged in protected activity, (2) he suffered an adverse employment action at the hands of [his employer]; and (3) [the employer] took the adverse action because of the protected activity." *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 190 (4th Cir. 2001).

It is undisputed Plaintiff engaged in a protected activity. In October 2021, she filed an EEO complaint alleging that the Defendants were discriminating against her on the basis of sexual orientation. *See Bryant v. Aiken Reg'l Med. Centers Inc.*, 333 F.3d 536, 543–44 (4th Cir. 2003) ("Employees are thus guaranteed the right to complain to their superiors about suspected violations of Title VII.").

Moreover, Plaintiff suffered adverse employment actions. First, for the first time in her career she received a mediocre performance evaluation. Evaluation; Kingrey Dep. 72:1–75:1. Second, just days after witnesses in her favor submitted declarations in the EEO investigation, she was informed, while serving in her civilian role, that the Defendants were opening a fraternization investigation against her. Kingrey 2d Decl. ¶ 6; Apr. 7, 2021 Email 2[16]; Kingrey

---

[16] Ambrose submitted her declaration in Plaintiff's EEO case on March 29 and Toby on March 31. By April 7, all three were under investigation for alleged fraternization.

Dep. 54:15–16 (noting that she was on technician leave when she was interviewed regarding fraternization). These facts are enough to satisfy the non-onerous *prima facie* case burden.

Inasmuch as the Defendants have not proffered a legitimate non-discriminatory reason for these retaliatory actions, they have failed to carry their own burden and are not entitled to summary judgment on the retaliation claim.

**D.    Plaintiff has not asserted "claims" outside the scope of her Title VII complaint**

Defendants mistakenly contend that Plaintiff has asserted claims outside the scope of her Title VII complaint. Not all acts alleged in a complaint are "claims." Sometimes the acts alleged are facts—to be proven by admissible evidence at trial—that render the ultimate unlawful act more likely to be true. Plaintiff's Complaint asserts just two claims: (1) Title VII sex discrimination based on the withdrawal of the HRDS position and the denial of the employee benefits positions, and (2) Title VII retaliation based on the retaliation suffered by Plaintiff because she filed an EEO complaint.

*1.    Plaintiff appropriately exhausted her claims of sex discrimination, as evidenced by the final EEO decision*

Plaintiff filed a complaint with the EEO on October 19, 2020. EEO Compl. That complaint asserted that both the rescission of the HRDS position and the denial of the Employee Benefits decision were discriminatory. *Id.*

It is undisputed that the EEO issued its final decision on August 25, 2021. Final Agency Decision. That decision addressed the denial of both positions. *Id.* That decision specifically authorized her to file her Title VII suit. *Id.* at 16. Accordingly, Count I is properly exhausted and may be heard by this Court.

>    2.    *Plaintiff's discrimination charge filed with EEO was sufficient to exhaust her*
>          *subsequent claim of retaliation*

Despite the Defendants' argument otherwise, Plaintiff was not required to separately exhaust her claim for retaliation, which was born out of her initial EEO complaint. The Fourth Circuit has explicitly found that such complaints do not require a second or separate exhaustion.[17]

>    3.    *Plaintiff is not required to exhaust all the evidence of the Defendants'*
>          *discrimination*

The statements made by Brigadier General Cadle and the additional homophobic and discriminatory comments Plaintiff endured during her time with the WVNG are not distinct "claims" under Title VII that require exhaustion, but rather are *evidence* of the Defendants' discriminatory motive and the discriminatory atmosphere within which their unlawful actions took place. Plaintiff is not required to exhaust the *facts* which support her claims. Indeed, ifplaintiffs were required to exhaust each and every fact that supports their Title VII claims, litigation would be stalled indefinitely due to the discovery process and an endless loop of EEO complaints.

---

[17] *See, e.g.*, *Jones v. Calvert Group, Ltd., 551 F.3d 297 (4th Cir. 2009), abrogated on other grounds; Montgomery v. Crothall Healthcare, Inc.*, 2021 WL 75136, at *4 (D. Md. Jan. 8, 2021) ("In sum, a plaintiff is not generally required to file a separate EEOC charge for retaliation in order to bring a Title VII claim for retaliation to this Court."); *Pinzon v. Sentara RMH Med. Ctr.,* 2021 WL 4303777 (W.D. Va. Sept. 21, 2021) (applying Jones to find that retaliation related back to filed EEO complaint). Many other circuits agree. *See Phillips v. Caris Life Scis., Inc*., 715 F. App'x 365, 369-70 (5th Cir. 2017) (citing *Gupta v. E. Tex. State Univ*., 654 F.2d 411 (5th Cir. 1981)); *Luevano v. Wal-Mart Stores, Inc*., 722 F.3d 1014, 1030 (7th Cir. 2013) (citing *McKenzie v. Ill. Dep't of Transp.*, 92 F.3d 473, 482-83 (7th Cir. 1996)).

E.      **Plaintiff's claims are timely**

Despite the Defendants' argument otherwise, all of Plaintiff's claims are timely.[18] 29

C.F.R. § 1614.105 provides, in relevant part,

> (a) Aggrieved persons who believe they have been discriminated against on the
> basis of race, color, religion, sex, national origin, age, disability, or genetic
> information must consult a Counselor prior to filing a complaint in order to try to
> informally resolve the matter.
>> (1) An aggrieved person must initiate contact with a Counselor within 45
>> days of the date of the matter alleged to be discriminatory or, in the case of
>> personnel action, within 45 days of the effective date of the action.

29 C.F.R. § 1614.105(a)(1). The Regulation continues to provide, that " [t]he agency or

the Commission shall extend the 45–day time limit in paragraph (a)(1) of this section

when the individual shows that he or she was not notified of the time limits and was not

otherwise aware of them." 29 C.F.R. § 1614.105(a)(2).

The Defendants argue that the claim concerning withdrawal of the HRDS position should

be barred because the withdrawal occurred more than 45 days prior to her initiating EEO contact.

That argument fails for two reasons. First, where defendants engage in ongoing discrimination,

the 45-clock does not start until the date of the last discriminatory act. Second, even if that were

not the case, § 1614.105(a)(1) is subject to waiver and should be waived in this case.

*1.      The Defendants engaged in ongoing discrimination and Plaintiff filed her EEO
         complaint with 45 days of the Defendants' last discriminatory act*

Because the Defendants engaged in ongoing discrimination, the 45-day time limit

established by 29 C.F.R. § 1614.105 started on the date of the "last discriminatory act," that is

the denial of the Employee Benefits position. *See Jakubiak v. Perry*, 101 F.3d 23, 2627 (4th Cir.

1996); *Blout v. Dept. of Health & Human Servs.*, 400 F. Supp. 2d 838, 842 (D. Md. 2004) ("To

---

[18] The Defendants concede that the Plaintiff's claims regarding the Employee Benefits position
are timely.

proceed under a theory of continuing violation in an employment discrimination action, a plaintiff must first show that an actual violation occurred within the requisite violations period.").

The Defendants' treatment of Plaintiff represents a pattern of continuous and ongoing discrimination that started when Brigadier General Cadle—the individual who expressly threatened that Plaintiff's career with the WVANG would be hindered if she did not make efforts to look more feminine—assumed the role of acting HRO. Shortly after he assumed a supervisory role with HRO, Plaintiff's HRDS position was rescinded. That position was reposted, and despite being told that she would be informed of any reposting, she was not alerted to the reposting. Thereafter, Plaintiff applied for the employee benefits position. Despite being more qualified, she was denied the position in favor of a non-veteran outside of Plaintiff's protected class.

Because as the unlawful denial of the employee benefits position occurred less than one month before Plaintiff filed her EEO complaint, "an actual violation occurred within the requisite violations period." *See* ECF No. 46, at 26 (conceding that Plaintiff's EEO contact for the employee benefits position was timely). Accordingly, the Defendants' motion for summary judgment based on "timeliness" should be denied.

     2.    *Even if the court finds that Defendants' discriminatory acts were discrete instances of discrimination, the 45-day time limit must be waived because Plaintiff was not aware of the time limit*

Under 29 C.F.R. § 1614.105(a)(2), the 45-day time limit can be waived "when the individual shows that he or she was not notified of the time limits and was not otherwise aware of them." *See Jakubiak v. Perry*, 101 F.3d 23, 27 (4th Cir. 1996).

The Defendants have adduced no facts suggesting that Plaintiff was informed of or otherwise aware of the 45-day time limit. On the other hand, Plaintiff declares that at no time was she advised of that time limit. Kingrey 2d Decl. ¶ 8. Since as the only evidence indicates that

Plaintiff was unaware of the time limitations imposed by the regulations, she is entitled to a

waiver, and the Defendants' motion based on 29 C.F.R. § 1614.105 should be denied.

   *3.*      *Plaintiff's retaliatory conduct claims are timely*

      As set forth above in Section D.2, *supra*, Plaintiff was not required to exhaust the

retaliation claims that were born out of her EEO complaint. Accordingly, 29 C.F.R. § 1614.105

is inapplicable to Count II of Plaintiff's complaint.

### III.      CONCLUSION

      In light of the foregoing, Plaintiff requests that the Court deny the Defendants' Motion to

Dismiss and/or for Summary Judgment (ECF No. 42) and allow Plaintiff to try her case to a jury.


                           Respectfully submitted,

                           Plaintiff Kristin M. Kingrey,
                           By Counsel.

                           */s/* Michael B. Hissam
                           Michael B. Hissam (WVSB #11526)
                           Casey E. Waldeck (WVSB #14001)
                           HISSAM FORMAN DONOVAN RITCHIE PLLC
                           P.O. Box 3983
                           Charleston, WV 25339
                           681-265-3802 *office*
                           304-982-8056 *fax*
                           mhissam@hfdrlaw.com
                           cwaldeck@hfdrlaw.com