IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

KRISTIN M. KINGREY,

           Plaintiff,

v.                                                      CIVIL ACTION NO. 2:21-cv-00612

CHRISTINE WORMUTH, et al.,

           Defendants.

MEMORANDUM OPINION AND ORDER

    Pending before the court is Defendants' Motion to Dismiss and/or for Summary Judgment. [ECF No. 42]. The motion offers several arguments in favor of dismissal, but the dispositive issue in this case is whether the intra-military immunity doctrine deprives this court of jurisdiction over the claims asserted by Plaintiff, a dual-status technician with both military and civilian roles. For the reasons explained below, I find that it does. Defendants' motion is **GRANTED**.

I.    **Background**

    This case involves claims of employment discrimination on the basis of sex, in violation of Title VII of the Civil Rights Act of 1964.

    Master Sergeant Kristin M. Kingrey ("MSgt Kingrey") is "a dual status technician" in the West Virginia National Guard. [ECF No. 1, ¶ 8]. She "is a female employee who identifies as a lesbian." *Id.* ¶ 12. Based on her outward appearance,

MSgt Kingrey "is often perceived as masculine" and "gender nonconforming." *Id.* ¶¶ 13–14.

"As a dual status technician, [MSgt] Kingrey is employed with the Department of the Air Force as an Air Transportation Craftsman[1] and as a[] [Human Resource Office] Benefits Specialist." *Id.* ¶ 10. The Human Resource Office ("HRO") position "is a civilian position within the federal government" and is "temporary in nature." *Id.* ¶¶ 11, 26.

In August 2018, MSgt Kingrey was deployed to Qatar. *Id.* ¶ 23. While in Qatar, she applied for the permanent position of Human Resource Development Specialist ("HRDS"). *Id.* ¶¶ 24–25. MSgt Kingrey remotely interviewed for the HRDS position on January 7, 2019, and was informed later that day that she had been selected for the role. *Id.* ¶¶ 28–29. MSgt Kingrey accepted the offer and "began completing paperwork to begin training for the . . . position." *Id.* ¶¶ 31–32.

When MSgt Kingrey returned to West Virginia in March 2019, she was placed on medical restrictions due to an injury she sustained while deployed. *Id.* ¶ 33. Her injury rendered her unable to assume the HRDS role. *Id.* ¶ 35. According to MSgt Kingrey, certain unspecified regulations provide that the "position could be temporarily filled," but once she was medically cleared, she "was to begin serving in the HRDS position." *Id.* ¶ 36. Although she remained on medical convalescence orders

---

[1] Since filing her Complaint, Plaintiff has "left her Air Transportation Craftsman position" and, as of May 2022, serves as "the First Sergeant for the 167th Aeromedical Evacuation Squadron." [ECF No. 56, at 3]. Because this matter involves allegations of past employment discrimination, the court will refer to MSgt Kingrey's work positions as they are alleged in the Complaint.

2

until December 2020, MSgt Kingrey "received training for the HRDS position" upon her return from deployment. *Id.* ¶ 34; [ECF No. 48, at 6].

After returning from Qatar, MSgt Kingrey was informed by Lieutenant Colonel ("Lt Col") Kelly Ambrose that Colonel Michael Cadle ("Brig Gen Cadle")[2] "had made negative, disparaging, and intentionally discriminatory remarks about Plaintiff Kingrey which were centered on her sex – including her sexual orientation and perceived gender nonconformity." [ECF No. 1, ¶ 37]. Specifically, MSgt Kingrey allegedly learned that Brig Gen Cadle had arranged for a meeting with Lt Col Ambrose during which he commented on MSgt Kingrey's "masculine features and requested and/or instructed [Lt Col] Ambrose to counsel . . . Kingrey on how to appear more feminine." *Id.* ¶ 41. During this conversation, Brig Gen Cadle allegedly told Lt Col Ambrose that MSgt Kingrey's career advancement "would suffer unless [she] began taking steps to make herself appear more feminine." *Id.* ¶ 42. At the time he allegedly made these remarks, Brig Gen Cadle "was the Vice Commander of the 130th Air Lift Wing" and supervised MSgt Kingrey, a member of that Wing. [ECF No. 42-1, at 3]. In his roles as Vice Commander, and later as Director of Joint Staff, Brig Gen Cadle "was actively involved in the hiring decisions" for his units. [ECF No. 1, ¶ 47].

According to MSgt Kingrey, she has dealt with other instances of discrimination and harassment from colleagues throughout her military career. *Id.*

---

[2] This individual has since been promoted from Colonel to Brigadier General ("Brig Gen"). *See* [ECF No. 42-12, at 30:2–6]. For clarity and consistency, the court will refer to Brig Gen Cadle and other military officers by their current titles, although they may have held a different rank at the time of the events in this case.

3

¶¶ 48–54. For example, MSgt Kingrey alleges that she is "frequently harassed for the length of her hair," and that she "was forced to 'try on' a women's Honor Guard jacket, in front of others, to confirm that none of the women's sizes would fit." *Id.* ¶¶ 48, 50. Another instance involved "colleagues and superiors perpetuating the rumor that [she] was 'transitioning' from female to male." *Id.* ¶¶ 51–52. When MSgt Kingrey reported the rumor to Brig Gen Cadle, he allegedly directed her to "work it out" with the superior believed to have started the rumor, and he insinuated that the disagreement was motivated by "a prior intimate relationship" with that superior, who also identifies as a lesbian. *Id.* ¶¶ 53–54. Until receiving the adverse employment decisions at issue in this case, MSgt Kingrey says that she largely "attempted to endure and tolerate these discriminatory acts and comments." *Id.* ¶ 56.

In March 2020, Brig Gen Cadle began acting "as a general supervisor over the HRO." [ECF No. 48-1, at 38:10]. Later that spring, MSgt Kingrey "received a phone call from Lieutenant Colonel Board informing her that the Army had pulled the funding for the HRDS position." [ECF No. 1, ¶ 59]. Within a few months, the position was reposted as a temporary role and subsequently "filled by a person outside the protected class." *Id.* ¶¶ 61, 68.

In September 2020, MSgt Kingrey applied for another role within the HRO, this time an Employee Benefits position. *Id.* ¶ 70. She had previously received relevant training and was certified for the position "at the grade level GS-11/12." *Id.* ¶¶ 71, 72. After interviewing before a panel, MSgt Kingrey "was notified that –

4

despite her experience and training – she had not been selected." *Id.* ¶ 73. The Employee Benefits position was awarded to "a non-veteran employee who is outside the protected class." *Id.* ¶ 74. MSgt Kingrey claims that the hiring panel was supervised by Brig Gen Cadle. *Id.* ¶ 80.

As a result of the alleged discrimination, MSgt Kingrey filed an Equal Employment Opportunity complaint in October of 2020. *Id.* ¶ 81. While her complaint was being investigated, MSgt Kingrey was notified that she was under investigation by the National Guard for an unprofessional relationship. *Id.* ¶ 84. She claims that her "primary witness," Lt Col Ambrose, was also investigated, and "other favorable witness(es) . . . were contacted and made to feel threatened." *Id.* ¶¶ 85–86. During the investigation, MSgt Kingrey received "her first negative performance appraisal." *Id.* ¶ 87. She claims that these retaliatory actions "resulted in a bias[ed] Final Agency Decision which fails and/or outright refuses to acknowledge the intentional, unlawful, discrimination and the supervisory authority [Brig Gen] Cadle held/holds over all those within the HRO." *Id.* ¶ 88.

On November 23, 2021, MSgt Kingrey filed a Complaint in this court against Christine Wormuth, Secretary of the Department of the Army, and Frank Kendall, Secretary of the Department of the Air Force, in their official capacities, based on federal question jurisdiction. She asserts two claims under Title VII: Sex Discrimination (Count I) and Retaliation (Count II). *Id.* at 12–18. To remedy her alleged injuries, MSgt Kingrey seeks appointment to the HRDS position,

5

appointment to the Employee Benefits position, compensatory damages, back pay, pre- and post-judgment interest, attorneys' fees and costs, and other equitable relief. *Id.* at 18–19.

On March 20, 2023, Defendants filed the instant Motion to Dismiss and/or for Summary Judgment. [ECF No. 42]. MSgt Kingrey responded to the motion on April 10, 2023, [ECF No. 48], and Defendants replied on April 19, 2023, [ECF No. 52]. The motion is ripe for review.

## II.  Legal Standard

Federal courts are courts of limited jurisdiction, meaning that they have the power to act solely in the areas authorized by Congress and the United States Constitution. *Strawn v. AT&T Mobility LLC*, 530 F.3d 293, 296 (4th Cir. 2008). The two bases for subject matter jurisdiction are federal question and diversity. *See* 28 U.S.C. §§ 1331, 1332. The only form of subject matter jurisdiction alleged to exist in this case is federal question jurisdiction. [ECF No. 1, ¶ 18].

Federal question jurisdiction "exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint." *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987); 28 U.S.C. § 1331. Here, MSgt Kingrey's Complaint plainly raises a federal question by asserting claims under Title VII, a federal statute. In this case, however, that threshold showing does not end the inquiry, because the defendants against whom she asserts her claims are both federal officials sued in their official capacities. It is well established that the United States, including its

officers, is immune from suit unless sovereign immunity has been waived. *Clendening v. United States*, 19 F.4th 421, 426 (4th Cir. 2021) (quoting *Sanders v. United States*, 937 F.3d 316, 327 (4th Cir. 2019)). Accordingly, Defendants argue they are immune from this suit because "Congress has not waived its sovereign immunity to allow uniformed members of the armed forces to pursue discrimination claims under Title VII." [ECF No. 43-1, at 7].

Defendants' challenges to the justiciability of Plaintiff's claims are properly raised in a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction. *See Randall v. United States*, 95 F.3d 339, 343 (4th Cir. 1996). "In ruling on a 12(b)(1) motion, the court may consider exhibits outside the pleadings." *Williams v. United States*, 50 F.3d 299, 304 (4th Cir. 1995) (citing *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977)). Moreover, insofar as the jurisdictional facts are in dispute, "the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Id.* But where a party challenges the sufficiency—rather than truthfulness—of the facts purported to sustain jurisdiction, the court must accept the plaintiff's allegations as true and consider the motion as it would a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). *Nacke v. United States*, 783 F. App'x 277, 279 (4th Cir. 2019).

A motion to dismiss pursuant to Rule 12(b)(6) tests the legal sufficiency of a complaint or pleading. *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008). To survive dismissal, "a complaint must contain sufficient factual matter, accepted as

7

true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

As the ensuing discussion will show, this case must be dismissed on jurisdictional grounds. Accordingly, the court treats Defendants' motion as a motion to dismiss under Rule 12 and does not reach their arguments in favor of summary judgment under Rule 56.

### III. Discussion

#### a. Dual-Status Technicians

Dual-status technicians are unique federal employees in that they occupy spaces in both the civilian and military realms. They are full-time civilian employees who are required as a condition of that employment to maintain membership in a military entity—in MSgt Kingrey's case, the National Guard. 32 U.S.C. § 709(b)(2); *see also* 10 U.S.C. § 10216(a)(1)(B).

These dual-status employees are "assigned to a civilian position as a technician" in "the organizing, administering, instructing, or training of the National Guard," "the maintenance and repair of supplies issued to the National Guard or the armed forces," and in the performance of other specified duties supporting the military. 32 U.S.C. § 709(a). In addition to maintaining membership in the relevant military branch, dual-status technicians must hold the appropriate "military grade" specified for their position, and they must "wear the uniform appropriate for the member's grade and component of the armed forces" while performing duties as a

dual-status technician. *Id.* § 709(b). When National Guard units are activated and deployed, dual-status technicians are designated "Absent – Uniformed Service" with respect to their civilian roles. [ECF No. 55, at 7–8; ECF No. 56, at 6].

### b. *Feres* and Title VII

Defendants argue that the intra-military immunity doctrine—also known as the *Feres* doctrine—divests this court of subject matter jurisdiction over Plaintiff's claims. Under this well-established doctrine, United States military personnel may not bring actions against the government for injuries that "arise out of or are in the course of activity incident to service." *Feres v. United States*, 340 U.S. 135, 146 (1950). This rule is "premised upon the disruptive nature of judicial second-guessing of military decisions." *Walch v. Adjutant Gen.'s Dep't of Tex.*, 533 F.3d 289, 296 (5th Cir. 2008) (citing *United States v. Brown*, 348 U.S. 110, 112 (1954)). In particular, the rule is concerned with "the disruption of the peculiar and special relationship of the soldier to his superiors that might result if the soldier were allowed to hale his superiors into court." *Chappell v. Wallace*, 462 U.S. 296, 304 (1983) (internal markings omitted). The *Feres* doctrine "may bar a claim in federal court even though its pursuit, under the particular circumstances of the case, might not weaken military discipline or interfere with discretion as to military matters." *Overton v. N.Y. State Div. of Mil. & Naval Affs.*, 373 F.3d 83, 91 (2d Cir. 2004). The breadth of the "incident to service" standard recognizes that "[t]he process of determining case-by-case the impact of litigation on the operation of the military would itself unduly intrude into

9

military affairs." *Id.* (citing *United States v. Stanley*, 483 U.S. 669, 682 (1987)); *see generally Hass for Use & Benefit of U.S. v. United States*, 518 F.2d 1138, 1141 (4th Cir. 1975) (explaining that "incident to service" is not "a narrow term restricted to actual military operations such as field maneuvers or small arms instruction" and has been held to encompass activities like "enjoying a drink in a noncommissioned officers club," "riding a donkey during a ballgame sponsored by the Special Services division of a naval air station," and "swimming in a swimming pool at an airbase"). Thus, the *Feres* doctrine "caution[s] against interference with military disputes in the absence of explicit congressional approval." *Aikens v. Ingram*, 811 F.3d 643, 650 (4th Cir. 2016). In this case, Defendants argue that the *Feres* doctrine prevents the court from finding that Congress has waived sovereign immunity with respect to MSgt Kingrey's claims.

Both of MSgt Kingrey's claims invoke Title VII, a federal law that prohibits discrimination in employment "based on race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-16(a). Title VII, which includes a congressional waiver of sovereign immunity, expressly applies to "employees . . . in military departments," *id.*, but that provision has been interpreted to apply only to civilian employees of the armed forces, *see, e.g., Randall*, 95 F.3d at 343; 29 C.F.R. § 1614.103 (Equal Employment Opportunity Commission regulation noting that Title VII applies to "[m]ilitary departments" but not to "[u]niformed members of the military departments"). Accordingly, the central question in this case is whether Plaintiff, as a dual-status

10

technician with both military and civilian roles, can bring her claims under Title VII. Defendants argue that MSgt Kingrey is a uniformed member of the armed forces whose claims arise out of her military service; thus, this court is deprived of jurisdiction. [ECF No. 46, at 7–21]. Plaintiff, meanwhile, contends that her claims "arise solely from her civilian role" and are therefore justiciable in this forum. [ECF No. 48, at 2].

### c. Applicability of *Feres* to MSgt Kingrey's Claims

The United States Court of Appeals for the Fourth Circuit has not yet spoken on the application of *Feres* to claims brought by dual-status technicians. Other circuits employ a variety of approaches, which fall into three general categories. On one end of the spectrum, the Sixth Circuit has held that dual-status technicians can never bring Title VII claims, even if the alleged discrimination arises in the course of their civilian roles, because the hybrid position as a whole "is irreducibly military in nature." *Fisher v. Peters*, 249 F.3d 433, 443 (6th Cir. 2001).

Most circuits to have considered the issue take a less categorical approach, holding that dual-status technicians may bring claims under Title VII if the claims arise from their civilian position. *See, e.g.*, *Wetherill v. Geren*, 616 F.3d 789, 798 (8th Cir. 2010); *Overton*, 373 F.3d at 90, 95; *Brown v. United States*, 227 F.3d 295, 299 (5th Cir. 2000); *Mier v. Owens*, 57 F.3d 747, 750 (9th Cir. 1995). Within this middle category, the courts of appeals employ several different standards to determine when claims are barred by *Feres*. For example, the Eighth Circuit applies "the standard

11

articulated in *Feres* itself" and simply asks "whether the injury arose out of activity incident to military service." *Wetherill*, 616 F.3d at 798. The Second Circuit looks to whether "the claim (1) challenges conduct integrally related to the military's unique structure, or (2) is not purely civilian." *Overton*, 373 F.3d at 95 (internal citations and quotation marks omitted). If the answer to either question is "yes," then the technician is barred from pursuing her Title VII claim. *Id.* The Fifth Circuit determines whether the challenged conduct can be traced to "actions taken within the military sphere," explaining that "claims arising purely from [a technician]'s civilian position are provided for under Title VII; claims that originate from [her] military status, however, are not cognizable." *Brown*, 227 F.3d at 299. The Ninth Circuit considers whether the conduct at issue is "integrally related to the military's unique structure." *Mier*, 57 F.3d at 750. That question is answered in the affirmative where personnel decisions raise concerns about "military hierarchy and discipline" as opposed to "discriminatory conduct on the part of peers or subordinates." *Id.* As a few circuits have explained, "these various standards of *Feres*" are not "inconsistent" and merely reflect "the unique facts and claims presented by the parties in those particular cases." *Wetherill*, 616 F.3d at 798 ("To ask . . . whether the conduct was 'integrally related to the military's unique structure,' or whether the position at issue is 'irreducibly military in nature,' is only to ask, as applied to a particular set of facts or a particular legal claim, whether the injury was incident to military service." (internal citations omitted)); *see also Walch*, 533 F.3d at 299 (describing another

12

circuit's standard as one of several "factors" the court might turn to "[i]f classification of a claim is difficult").

At the other extreme, the Federal Circuit has suggested that dual-status technicians are almost always considered civilian employees who therefore may bring statutory claims of discrimination against the government. *Jentoft v. United States*, 450 F.3d 1342, 1348 (Fed. Cir. 2006). *Jentoft* involved a claim under the Equal Pay Act, which applies to federal civilian employees. The court relied on 10 U.S.C. § 10216, which was amended in 1997 to state that a dual-status technician "is a Federal civilian employee" for purposes of "any other provision of law." The Federal Circuit, noting the lack of any limiting language, found this provision "sufficient to indicate Congress' purpose to remove dual-status technicians from the ambit of judge-made doctrines such as *Feres*." *Wetherill*, 616 F.3d at 795. Thus, *Jentoft* announced a categorical rule by which dual-status technicians must be treated as civilian employees for purposes of any provision of law. 450 F.3d at 1349. The other circuits to have addressed this issue have uniformly rejected the *Jentoft* approach. *See, e.g.*, *Wetherill*, 616 F.3d at 796–97; *Walch*, 533 F.3d at 299–300; *Zuress v. Donley*, 606 F.3d 1249, 1254 (9th Cir. 2010). Those courts found that the 1997 amendments "did not effect such a substantive change," *Zuress*, 606 F.3d at 1254, and instead were merely "designed to harmonize the nomenclature to be used for dual-status technicians throughout the U.S. Code," *Wetherill*, 616 F.3d at 796. Moreover, "it would have been odd for Congress fundamentally to alter the legal condition of dual-

13

status technicians in 10 U.S.C. § 10216, a statute that overwhelmingly just addresses the details of obtaining funding for National Guard positions." *Id.* at 796–97 ("Congress 'does not, one might say, hide elephants in mouseholes.'" (quoting *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001))). The Fourth Circuit has yet to address the treatment of dual-status technicians under *Feres*, but its commentary on the doctrine in other contexts suggests the court would likely reject the *Jentoft* interpretation. *See, e.g.*, *Aikens*, 811 F.3d at 651 ("[T]he Supreme Court has embarked on a course dedicated to broadening the *Feres* doctrine to encompass, at a minimum, *all* injuries suffered by military personnel that are even remotely related to the individual's *status* as a member of the military." (quoting *Stewart v. United States*, 90 F.3d 102, 105 (4th Cir. 1996))).

Of these three categories, the middle approach appears most consistent with the relevant statutes and with the policies underlying the intra-military immunity doctrine. The *Feres* doctrine "is designed in large measure to prevent civilian courts from interfering with military discipline and decision-making," and "to prevent federal courts from exercising constitutional powers that are delegated to Congress and the Executive Branch." *Overton*, 373 F.3d at 89–90. A dual-status technician's claim, if civilian in nature, causes minimal intrusion on the military while furthering the anti-discriminatory purposes of Title VII. On the other hand, there are "persuasive reasons to conclude that the *Feres* doctrine may apply" to a dual-status technician's lawsuit based on alleged actions taken while she was in a civilian role.

14

*Id.* at 92. A technician's "employment as a civilian is ordinarily in support of a mission that is ultimately military in nature," and thus, "the civilian employment of Guard Technicians is often incident to military service." *Id.* Additionally, "there are concerns about the intrusive nature of the inquiry that would be necessary for a federal court to disentangle a plaintiff's civilian and military duties if the *Feres* doctrine were applicable only to suits arising out of the latter." *Id.* (first citing *Stanley*, 483 U.S. at 683 ("[T]he mere process of arriving at correct conclusions would disrupt the military regime."); and then citing *Lutz v. Sec'y of Air Force*, 944 F.2d 1477, 1487 (9th Cir. 1991) ("[W]here it is sufficiently ambiguous whether challenged actions were 'incident to military service,' and the process of disentangling conduct not incident to service from that incident to service would itself work an impermissible intrusion upon military matters, *Feres* must be applied to the whole course of conduct.")). Accordingly, I adopt the approach followed by a majority of circuits and hold that the *Feres* doctrine bars Title VII claims only "where the injuries arise out of or are in the course of activity incident to military service." *Overton*, 373 F.3d at 90 (quoting *Stanley*, 483 U.S. at 672) (internal markings omitted).

Notably, in none of the above-cited cases were the dual-status technician's claims ultimately found justiciable under *Feres*. As at least one court has observed, "what exists in theory may not always exist in practicality." *Norris v. McHugh*, 857 F. Supp. 2d 1229, 1234 n.5 (M.D. Ala. 2012), *aff'd sub nom. Norris v. Sec'y, U.S. Dep't of Army*, 517 F. App'x 878 (11th Cir. 2013). But be that as it may, "a dual-status

15

military technician may, at least in theory, bring suit under Title VII" for claims arising out of her civilian status, *id.* at 1233, and no court has yet considered the facts presented here.

Having determined the appropriate standard, I now apply that approach to the instant case. As explained below, I find that MSgt Kingrey's claims arise out of activities "incident to service" and are therefore barred in this court.

This case presents a close call given that the adverse employment actions at issue were clearly directed toward roles designated as civilian. Specifically, MSgt Kingrey alleges: that "she was denied two separate *civilian* technician positions because of her sex," [ECF No. 56, at 2]; that she was the subject of a retaliatory investigation into an "unprofessional relationship," which is broader than the distinctively military concept of "fraternization," *see id.* at 8–9; [ECF No. 55, at 9–14]; and that she was further subjected to retaliation in the form of "her first negative performance appraisal" for her civilian position, [ECF No. 1, ¶ 87].

Nevertheless, MSgt Kingrey's claims are inextricably linked to her military service. At the time the challenged actions were taken, Plaintiff had returned from deployment but was still "considered to be on active duty" while on medical convalescence orders. [ECF No. 48-3, at 12:16–22]. More importantly, MSgt Kingrey's claims implicate "the peculiar and special relationship of the soldier to [her] superiors." *Chappell*, 462 U.S. at 300. "Civilian courts must, at the very least, hesitate long before entertaining a suit which asks the court to tamper with the established

relationship between enlisted military personnel and their superior officers; that relationship is at the heart of the necessarily unique structure of the military establishment." *Id.* MSgt Kingrey largely challenges conduct allegedly committed by, or traceable to, Brig Gen Cadle, who "was serving as the Director of Joint Staff and Interim Head of HRO at the time Plaintiff Kingrey's HRDS position was rescinded." [ECF No. 1, ¶ 98]. Prior to joining the Joint Staff, Brig Gen Cadle served as Vice Commander of the 130th Air Lift Wing and, prior to that role, as Commander of the Wing's Mission Support Group, to which Plaintiff was assigned at that time. [ECF No. 42-1; ECF No. 55; ECF No. 48-5, at 31:7–8 (Brig Gen Cadle testifying that Plaintiff "was in a subordinate unit of [his]")]. In both his military and civilian roles, Brig Gen Cadle "exercised authority and supervision over Plaintiff Kingrey." [ECF No. 1, ¶ 76]; *see, e.g.*, [ECF No. 48-5, at 63:24 (stating that when MSgt Kingrey was harassed by other colleagues, she reported the incident to Brig Gen Cadle as "her section chief"); ECF No. 48-3, at 46:16–20 (stating that Brig Gen Cadle initiated the arrangements for Plaintiff's Honor Guard jacket); ECF No. 48-1, at 38:23–39:15 (Lt Col Board confirming that Brig Gen Cadle "approved all job announcements for distribution and signed selection documents" in his role as Interim HRO)]. Thus, MSgt Kingrey's suit, if permitted to proceed, would likely affect her military relationship with Brig Gen Cadle. Brig Gen Cadle denies most of the allegations against him, and he notes that "there were so many levels between [him and MSgt Kingrey]" that he "had no day to day oversight supervision or engagement with her."

17

[ECF No. 48-5, at 37:7–12]. But it is undisputed that Brig Gen Cadle was Plaintiff's superior, *id.* ("She was in an organization that I was in and I was the highest level commander."), and thus, "disruption of the peculiar and special relationship of the soldier to [her] superiors . . . might result if [MSgt Kingrey] were allowed to hale [Brig Gen Cadle] into court," *Chappell*, 462 U.S. at 304. Moreover, "[a]ny attempt to surgically dissect and analyze the civilian relationship between [MSgt Kingrey] and [Brig Gen Cadle], with its military dimensions, . . . would itself threaten to intrude into their military relationship." *Overton*, 373 F.3d at 96; *see also Chappell*, 462 U.S. at 305 ("[C]ourts are ill-equipped to determine the impact upon discipline that any particular intrusion upon military authority might have."). Additionally, MSgt Kingrey's allegations implicate "the application of military rules and regulations and decisions regarding personnel management and the allocation of military budget resources." [ECF No. 52, at 7 (discussing Plaintiff's argument that budgetary concerns were merely pretext for refusing her the HRDS position on impermissible grounds)]. Such matters "go directly to the 'management' of the military" and are "the *type* of claims that, if generally permitted, would involve the judiciary in sensitive military affairs at the expense of military discipline and effectiveness." *United States v. Shearer*, 473 U.S. 52, 58–59 (1985).

Because MSgt Kingrey's suit "would likely intrude into" her military relationships and other aspects of military administration, I conclude that the challenged conduct is "integrally related to the military's unique structure," and her

18

claims therefore arise out of activity "incident to military service." *Overton*, 373 F.3d at 90, 96 (holding *Feres* barred Title VII suit that "would likely intrude into" the plaintiff's "nominally civilian, yet distinctly military, relationship" with his superior); *see Norris*, 857 F. Supp. 2d at 1235–36 (holding *Feres* barred Title VII suit where "those who made the decision to remove [plaintiff] from her civilian position served the dual roles of military and civilian supervisors"). Accordingly, the intra-military immunity doctrine prevents this court from hearing MSgt Kingrey's claims, which are more appropriately addressed through the military's own grievance processes. *See Chappell*, 462 U.S. at 302 ("Congress has exercised its plenary constitutional authority over the military, has enacted statutes regulating military life, and has established a comprehensive internal system of justice to regulate military life, taking into account the special patterns that define the military structure.").

IV. **Conclusion**

For the foregoing reasons, Defendants' Motion to Dismiss and/or for Summary Judgment [ECF No. 42] is **GRANTED**. Plaintiff's claims are hereby **DISMISSED without prejudice**.

The court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party. The court further **DIRECTS** the Clerk to post a copy of this published opinion on the court's website, www.wvsd.uscourts.gov.

ENTER: August 10, 2023

JOSEPH R. GOODWIN
UNITED STATES DISTRICT JUDGE